Formatted for Electronic Distribution                                                             Not for Publication

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT



Filed & Entered
On Docket
11/18/04

In re:

**GERARD M. COSTELLO and
KATHLEEN D. COSTELLO,**
        **Debtors.**

Chapter 7 Case
# 03-11517

## MEMORANDUM OF DECISION
### GRANTING MIDDLEBURY EQUITY PARTNERS' MOTION FOR SANCTIONS

      On April 22, 2004, attorneys for Middlebury Equity Partners, L.L.C. ("MEP") filed a motion for sanctions under 28 U.S.C. § 1927 (the "Motion for Sanctions"), seeking monetary sanctions against the Debtors' attorney, Christopher O'C. Reis, for his conduct in connection with two hotly contested motions for relief from stay filed by MEP. Mr. Reis filed a written opposition to the Motion for Sanctions on May 5, 2004 (the "Opposition"). After engaging in discovery on the Motion for Sanctions and the Opposition, the parties presented evidence to the Court on August 6, 2004. The issue presented is whether Mr. Reis engaged in conduct that "unreasonably and vexatiously multiplied the proceedings," such that MEP would be entitled to collect its attorney's fees from Mr. Reis as a sanction, pursuant to 28 U.S.C. § 1927. After considering the memoranda of law and evidence offered by the parties, and the applicable case law, the Court finds that Mr. Reis' conduct, namely the delay in filing the Debtors' consent to MEP's Motions for Relief from Stay, did unreasonably and vexatiously multiply the proceedings, that Mr. Reis acted in bad faith and that Mr. Reis took actions that appear to the Court to have been intended to delay MEP's relief from stay and increase MEP's costs. With regard to the amount of sanctions, the Court finds that certain attorney's fees incurred and requested by MEP in the Motion for Sanctions are not properly charged to Mr. Reis and the Court therefore declines to award the full amount of sanctions sought by MEP.

      This Court has jurisdiction over the Motion for Sanctions pursuant to 28 U.S.C. §§ 157 (b) and 1334.

### PROCEDURAL BACKGROUND

      In order to evaluate the conduct that is the subject of the Motions for Sanctions, it is necessary to describe, in some detail, the factual background and circumstances surrounding Mr. Reis' representation of the Debtors throughout the litigation of MEP's Motions for Relief from Stay. It is also necessary to review the interaction among the Debtors, Mr. Reis and counsel for Christiana Bank & Trust ("CBT") in the context of CBT's motion for relief from stay and, ultimately, how Mr. Reis' professional conduct toward MEP differed from his professional conduct toward CBT even though both filed motions for relief from stay seeking to enforce rights against essential assets of the Debtors.

On January 29, 2004, CBT filed a renewed motion for relief from stay to pursue its rights against the Inn at Mount Snow and the Ironstone Lodge, real estate owned by the Debtors (doc. # 66) ("CBT's Motion for Relief from Stay"). Shortly thereafter, on February 4, 2004, MEP filed two motions for relief from stay. The first MEP motion for relief from stay sought authority to enforce MEP's rights against three parcels of real estate: the Higley Hill Inn, the "barn parcel," and the "condominium parcel" (doc. # 71). Also on February 4, 2004, MEP filed a second motion for relief from stay sought authority to pursue MEP's rights against non-real estate collateral, namely, the Debtors' stock interest in Deacon's Den, Inc. and the Debtors' membership interests in West Dover Realty Group, L.L.C. (doc. #70)(collectively, "MEP's Motions for Relief from Stay"). On February 17, 2004, Mr. Reis, on behalf of the Debtors, filed an Omnibus Opposition to Motions for Relief from Stay (doc. # 75) (the "Omnibus Opposition") opposing both CBT's Motion for Relief from Stay and MEP's Motions for Relief from Stay. The one-page Omnibus Opposition made blanket assertions that the properties in question "have significant equity" and that the properties "are necessary for an effective reorganization" (doc. # 75, ¶¶ 1 and 2). No facts were articulated and no affidavits were submitted to support these allegations. However, the Omnibus Opposition requested an evidentiary hearing on March 9, 2004, and stated, "Specific factual assertion [sic] in response to the allegations made in the motions will be presented at the hearing through evidence." Id. at ¶ 3.

Presumably in response to the evidentiary hearing referred to in the Omnibus Opposition, MEP filed a motion to shorten time for discovery responses in connection with MEP's Motions for Relief from Stay (doc. # 76). Specifically, MEP sought a shortened time period for the Debtors to respond to written discovery requests on the questions of whether the Debtors had equity in the properties and if the properties were necessary for an effective reorganization.[1] The Court granted MEP's motion to shorten time (doc. # 81). In the responses to MEP's interrogatories, the Debtors once again made blanket, conclusory assertions that the property has value in excess of debt secured and that the Debtors have equity in the various properties, without any factual support or substantiation (doc. # 125, Exhibit 2).

On February 18, 2004, CBT, MEP, and the Debtors filed a Rule 9014(e) Notice of Evidentiary Hearing (doc. # 77) (the "Notice"). The Notice specifically identified the witnesses CBT and MEP intended to call, including expert appraisers, but the Debtors identified no witnesses that the Debtors intended to call. The Court ordered the Debtors, MEP and CBT to file a pre-hearing statement, including lists of exhibits and witnesses and any stipulations regarding proposed exhibits (doc. # 84). In the Pre-Hearing Statement submitted, the Debtors identified four witnesses: the two Debtors and two attorneys, including Thomas Durkin, Esq. whose expected testimony was described as follows:

---

[1] At all times relevant to the instant motion, the Debtors were in chapter 11.

> Mr. Durkin is expected to testify as to his personal knowledge of the circumstances surrounding the various loan transactions involving the debtors and Mr. Enright. Included in the testimony is expected that allegations of numerous breaches of promises to fund and to provide accountings and to provide itemization and copies of expenses will be detailed. Finally, there is expected to [sic] the testimony regarding knowledge of activities within the state [sic] Vermont relative to the license lending statutes.

(doc.# 87). The Debtors were the only witnesses listed in the Pre-Hearing Statement who were to be called to testify as to the valuation of the various properties. The remaining witnesses, attorneys Durkin and Frechette, were expected to testify as to lender licensing issues in the state of Vermont.[2] The Court heard evidence on CBT's Motion for Relief from Stay and MEP's Motions for Relief from Stay over the course of three days (on March 9, 15 and 18, 2004). CBT and MEP presented testimony and documentary evidence regarding the Debtors' outstanding obligations on the multiple notes, the liens and attachments against the various parcels of real property and the market value of these properties. MEP also presented evidence as to the liens and attachments against the Debtors' stock in Deacon's Den, Inc. and their membership interests in West Dover Realty Group, L.L.C. The Debtors presented no persuasive evidence as to whether CBT or MEP was adequately protected or whether the various properties were necessary for an effective reorganization. Mr. Durkin's testimony was excluded. Upon the close of evidence on March 18, 2004, the Court reserved decision and directed the parties to file proposed findings of fact and conclusions of law. All proposed findings of fact and conclusions of law with regard to the CBT Motion for Relief from Stay were due no later than March 26, 2004, and with regard to MEP's Motions for Relief from Stay, no later than April 2, 2004.

On March 26, 2004, CBT filed its Proposed Findings of Fact and Conclusions of Law (doc. # 102) ("CBT's Proposed Findings"). The Debtors filed a consent to CBT's Motion for Relief from Stay (doc. #101) (the "Consent to CBT Relief") approximately thirty minutes before CBT filed its Proposed Findings, rather than filing any proposed findings of fact or conclusions of law. The Consent to CBT Relief contained an averment that Mr. Reis, as counsel for the Debtors, had discussed the consent and worked toward a stipulated order with CBT's counsel which was filed concurrently with the Consent to CBT Relief (doc. # 101, ¶¶ 1-4). The Court signed the stipulated order granting CBT relief from stay (doc. # 119).

MEP and the Debtors' were to file their respective proposed findings of fact and conclusions of law with respect to the MEP Motions for Relief from Stay one week later, on April 2, 2004. On April 2, 2004, MEP filed separate proposed findings of fact and conclusions of law with respect to each of MEP's Motions for Relief from Stay (docs. ## 108 and 109) (collectively, "MEP's Proposed Findings"), pursuant to the

---

[2] Allegations regarding violations of the lender licensing statutes in Vermont have since been raised in a separate adversary proceeding, A.P. # 04-1016.

Court's directive. The Debtors did not file any proposed findings of fact or conclusions of law as to either MEP motion. Rather, the Debtors filed a consent to the relief requested in MEP's Motions for Relief from Stay (doc. # 111) (the "Consent to MEP Relief"). Unlike the Debtors' Consent to CBT Relief, there was no representation or averment that Mr. Reis had discussed or otherwise been in contact with MEP's counsel in connection with the Consent to MEP Relief, or that settlement discussions were the basis for this consent; no stipulated order accompanied the Debtors' Consent to MEP Relief.

MEP filed the Motion for Sanctions twenty (20) days later. The parties conducted discovery with respect to the Motion for Sanctions over a period of several months, participated in numerous scheduling conferences, and presented evidence at a half-day hearing held on August 6, 2004. Norman Williams, Esq. testified on behalf of MEP and Christopher O'C. Reis, Esq. testified on behalf of himself. The Debtors did not appear at the evidentiary hearing on the Motions for Sanctions and Mr. Reis did not have counsel at the hearing representing him.

MEP seeks sanctions against Mr. Reis in the amount of the attorney's fees it incurred after the hearing concluded on March 18, 2004, up until the submission of M.E.P.'s Proposed Findings. MEP argues that Mr. Reis' refusal to consent earlier to the relief sought in MEP's Motions for Relief from Stay was an unreasonable and vexatious multiplication of proceedings under 28 U.S.C. § 1927. MEP claims that Mr. Reis' failure to introduce any admissible evidence on the necessary elements for the Debtors to prevail on MEP's Motions for Relief from Stay, Mr. Reis' misrepresentation that he would be preparing the proposed findings of fact and conclusions of law as directed by the Court, and his withholding of the Consent to MEP Relief until after MEP had incurred legal fees for the drafting of MEP's Proposed Findings warrant the imposition of sanctions against Mr Reis.

## DISCUSSION

### I. JURISDICTION OF THE BANKRUPTCY COURT

Although some circuits have held that bankruptcy courts lack jurisdiction to impose sanctions under 28 U.S.C. § 1927 (see, e.g., In re Courtesy Inns, Ltd., 40 F.3d 1084, 1086 (10th Cir.1994)), the Court of Appeals for the Second Circuit has held that bankruptcy courts do have authority to impose sanctions pursuant to this provision. In re Cohoes Industrial Terminal, Inc., 931 F.2d 222, 230 (2d Cir. 1991); see also, In re Dubrowsky, 206 B.R. 30, 36 (Bankr. E.D. N.Y. 1997), aff'd, 244 B.R. 560 (E.D. N.Y. 2000). In addressing matters arising within this Court's statutorily circumscribed core jurisdiction, bankruptcy courts clearly have need of § 1927. As one bankruptcy court within the Second Circuit has observed:

> § 1927's underlying purpose is best discerned in the context of the mandate found in Rule 1 of the Federal Rules of Civil Procedure which provides that the civil rules 'shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.' § 1927 provides the substantive

means for enforcement of the policy articulated in Rule 1.

In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc., 238 B.R. 531, 553 (Bankr. E.D. N.Y. 1999). Rule 1001 of the Federal Rules of Bankruptcy Procedure contains an identical mandate. While the Court acknowledges that it is a court of narrowly defined jurisdiction, it believes that Congress gave this Court jurisdiction to impose sanctions, when necessary and it is appropriate to do so within the parameters articulated by the Second Circuit. In re Cohoes Industrial Terminal, Inc., 931 F.2d at 230; see also, People of New York v. Operation Rescue National, 80 F.3d 64, 72 (2d Cir.), cert. denied, sub nom, Broderick v. U.S., 519 U.S. 825 (1996) ("[Section 1927] is designed to deter unnecessary delays in litigation by imposing upon attorneys an obligation to avoid dilatory tactics.").

## II. DUE PROCESS CONCERNS AND PARTICULAR CONDUCT

As the Second Circuit has observed,

> Sanctions may be authorized by any of a number of rules or statutory provisions, or may be permissible on the basis of the court's inherent power. Because the various sources of the court's authority are governed by differing standards, ... it is imperative that the court explain its sanctions order with care, specificity, and attention to the sources of its power.

Sakon v. Andreo, 119 F.3d 109, 113 (2d Cir.1997) (internal quotation omitted) (citing In re Ames Department Stores, Inc., 76 F.3d 66, 70 (2d Cir.1996); MacDraw, Inc. v. CIT Group Equipment Financing, Inc., 73 F.3d 1253, 1262 (2d Cir.1996)). MEP's Motion for Sanctions under 28 U.S.C. § 1927 seeks to assess against Mr. Reis particularly for that portion of its attorney's fees incurred in its counsel's preparation of MEP's Proposed Findings. The motion very clearly delineates the conduct it seeks to have punished.

Section 1927 provides that a lawyer who multiplies proceedings unreasonably and vexatiously may personally be assessed the excess costs, expenses, and attorney's fees reasonably incurred as a result. Section 1927 is intended to curb dilatory practices and the abuse of court processes by attorneys. In re 60 East 80th Street Equities, Inc., 218 F.3d at 117. The Court is mindful that the sanctions authorized under § 1927 are not to be imposed lightly; nor are they to be triggered because a lawyer vigorously and zealously pressed his or her clients' interests. Id. The Court of Appeals for the Second Circuit has cautioned:

> The power to assess the fees against an attorney should be exercised with restraint lest the prospect thereof chill the ardor of proper and forceful advocacy on behalf of his client. To justify the imposition of excess costs of litigation upon an attorney his conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation. The section is directed against attorneys who willfully abuse judicial processes.

Id.

Further, the Court recognizes that due process requires that courts provide notice and an opportunity to be heard before imposing any kind of sanctions. In re 60 East 80th Street Equities, Inc., 218 F.3d 109, 115 (2d Cir. 2000); In re Ames Dep't Stores, Inc., 76 F.3d 66, 70 (2d Cir.1996).

> An attorney whom the court proposes to sanction must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges.

Sakon v. Andreo, 119 F.3d 109, 114 (2d Cir. 1997) (internal quotation marks omitted). At a minimum, the notice requirement mandates that the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered, so that the subject of the sanctions motion can prepare a defense. See id. at 114. The opportunity to respond is judged under a reasonableness standard: a full evidentiary hearing is not required; the opportunity to respond by brief or oral argument may suffice. See, e.g., Klein v. Ulster Sav. Bank, 127 F.3d 292, 295 (2d Cir.1997) (per curiam) (collecting cases supporting this proposition and remanding the matter to the district court to give attorney a chance to be heard on imposition of sanctions because no such opportunity had been given); In re 60 East 80th Street Equities, Inc., 218 F.3d at 117.

In the case at bar, the Motion for Sanctions clearly specifies both that § 1927 is the source of the authority for the sanctions being sought, and that the failure to consent to relief from stay between the date the evidentiary hearing concluded and the date MEP filed its Proposed Findings is the conduct they seek to have sanctioned. Hence, the Court finds that Mr. Reis had adequate notice of the issue presented. Moreover, the Motion for Sanctions was filed in late April and the hearing was held in early August, 2004, thus allowing Mr. Reis ample opportunity to engage in discovery, file written opposition and memoranda of law, and otherwise prepare for presentation of his defense to the motion. Due process rights are of paramount concern. Thus, the Court carefully circumscribes its scope of inquiry to consider only the facts, circumstances and conduct directly involved in Mr. Reis' delay in consenting to MEP's Motions for Relief from Stay, and scrutinizes the request for attorney's fees to ensure that any sanction imposed corresponds to an amount that is causally related to the alleged misconduct. The Court relies exclusively upon the record before it and the testimony presented at the hearing on the Motion for Sanctions.

### III. WHETHER MR. REIS' CONDUCT IS PUNISHABLE BY 28 U.S.C. § 1927

Title 28, § 1927 of the United States Code provides that a court may impose sanctions on an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Sanctions may be imposed, however, "only when there is a finding of conduct constituting or akin to bad faith." Sakon v.

Andreo, 119 F.3d 109, 114 (2d Cir.1997). An award of sanctions under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay. State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada,, 374 F.3d 158, 180 (2d Cir. 2004); see also, In re 60 East 80th Street Equities, 218 F.3d 109, 115 (2d Cir.2000); Agee v. Paramount Communications, Inc., 114 F.3d 395, 398 (2d Cir. 1997); Keller v. Mobil Corp., 55 F.3d 94, 99 (2d Cir.1995); United States v. International Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir.1991).

Thus, to impose sanctions under 28 U.S.C. § 1927, this Court must find clear evidence that (1) Mr. Reis' arguments in defense of his delay in filing the Consent to MEP Relief are without merit; and (2) in failing to file the Consent to MEP's Motions for Relief, Mr Reis acted for improper purposes. Salovaara v. Eckert, 222 F.3d 19, 35 (2d Cir. 2000). Section 1927 "looks to unreasonable and vexatious multiplications of proceedings." United States v. International Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir.1991). The Rule obliges "attorneys throughout the litigation to avoid dilatory tactics." Pentagen Technologies v. Intern., LTD., 172 F.Supp.2d 464, 473 (S.D.N.Y.2001). The Second Circuit has required a particularized showing of bad faith to justify sanctions under Section 1927. Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir.1986). **However,** bad faith may be inferred when the attorney's actions are so meritless as to require the finding that they must have been undertaken for some improper purpose such as delay. Shafii v. British Airways PLC, 83 F.3d 566, 571 (2d Cir.1996); People of Vacco v. Operation Rescue National, 80 F.3d 64, 72 (2d Cir.1996); International Bhd. of Teamsters, 948 F.2d at 1345; Salovaara, 222 F.3d at 35. After consideration of the papers filed and the testimony presented in connection with the Motion for Sanctions and the Opposition, the Court is persuaded that Mr. Reis' delay in filing the Consent to MEP Relief was not justifiable and was undertaken for an improper purpose, namely to delay MEP and to increase MEP's expenses in connection with its enforcement of its rights against the Debtors' property.

Mr. Williams testified that he first began discussions with Mr. Reis regarding the Debtors' possible defenses to MEP's Motions for Relief from Stay right around the time MEP filed those motions. (Tr. p. 5). At some point, it became clear to Mr. Williams that the Debtors' main defense to MEP's Motions for Relief from Stay was based upon allegations of MEP's violation of the state licensed lender statutes. (Tr. p. 7). After three days of evidence on MEP's Motions for Relief from Stay where the Debtors were unable to introduce Mr. Durkin's testimony and failed to introduce any other evidence in support of their averments in the Omnibus Opposition as to equity and reorganization, Mr. Williams initiated contact with Mr. Reis to

determine whether the Debtors would consent to the requested relief.[3] (Tr. p. 8). Mr. Williams initiated this contact prior to drafting of MEP's Proposed Findings (Tr. p. 8; MEP Exhibit 2). When it became evident to him that no resolution could be reached, Mr. Williams spent several hours drafting MEP's Proposed Findings. (Id.). In fact, the testimony in connection with the Motion for Sanctions revealed that while Mr. Reis had talked with MEP's counsel during the first week after the conclusion of evidence on MEP's Motions for Relief from Stay, Mr. Reis did not have any communication with MEP's counsel during the second week, and it was at that point that MEP's counsel began preparing MEP's Proposed Findings. (Tr. pp. 8, 11; MEP Exhibit 2). The Debtors' filing of the Consent to MEP Relief came as a complete surprise to MEP, since Mr. Reis had not contacted Mr. Williams prior to filing this consent. (Tr. pp. 8, 11). The Court is persuaded that if Mr. Reis had contacted Mr. Williams to notify him of the Debtors' intent to consent to relief promptly after concluding that the Debtors had no possibility of either settling MEP's Motions for Relief from Stay, Mr. Williams would not have prepared the MEP Proposed Findings and thus, MEP would not have incurred the additional legal expenses. (Tr. p. 10).

### A. COURSE OF DEALING WITH CBT

The Court's observation of Mr. Reis' conduct with regard to CBT's Motion for Relief from Stay and the Debtors' Consent to CBT Relief is not a factor the Court considers in reaching its conclusions about the appropriateness of imposing sanctions upon Mr. Reis. That is beyond the scope of the Motion for Sanctions. However, the Court sets out background facts with respect to the CBT litigation because they provide critical context for analyzing Mr. Reis' conduct with respect to the Debtors' Consent to MEP Relief. The importance of this context is underscored by the fact that the parties both presented evidence at the hearing on the Motion for Sanctions regarding Mr. Reis' negotiation of the Consent to CBT Relief.

During his testimony, Mr. Reis acknowledged that by the conclusion of hearings on the CBT Motion for Relief from Stay and MEP's Motions for Relief from Stay, the Debtors knew they had no defenses.[4] (Tr. p. 65). In fact, Mr. Reis testified that the Debtors agreed at the conclusion of the hearing to consent to CBT's Motion for Relief from Stay. (Tr. p. 46; 69). However, Mr. Reis did not file the Consent for CBT Relief until

---

[3] The Court excluded the testimony of Thomas Durkin, who Mr. Reis offered to testify that he met with and received e-mail correspondence in Vermont from MEP's principal, Todd Enright. MEP did not dispute that correspondence took place in Vermont. However, Mr. Reis did not make any proffer as to how the meetings or e-mail correspondence could establish lender liability or grounds for voiding MEP's mortgages. (See doc. # 97). To the extent that Mr. Reis has intimated that he would have had viable defenses to MEP's Motions for Relief from Stay but for the Court's exclusion of Mr. Durkin's testimony, this argument is without merit. While Mr. Reis may have hoped to introduce a significant amount of evidence as to the alleged violations of the state's licensed lender statutes at the hearing on MEP's Motions for Relief from Stay (Tr. p. 95), the Court's exclusion of this specific evidence cannot justify, explain, or otherwise excuse Mr Reis' delay in filing the Consent to M.E.P. Relief for two weeks.

[4] As referenced previously, the evidentiary hearings regarding the three motions for relief from stay were consolidated.

one week later. (Tr. p. 46). During the week between the close of evidence and the date for CBT and the Debtors to file their proposed findings of fact and conclusions of law on CBT's Motion for Relief from Stay, Mr. Reis engaged CBT's counsel in settlement negotiations. (Tr. p. 47). According to Mr. Reis, if the Debtors could have reached a settlement with CBT, this would have given them the leverage they needed to negotiate a settlement with MEP (Tr. p. 51). As reflected in Mr. Reis' Exhibit A, on March 25, 2004, settlement negotiations between CBT and the Debtors broke down. The next day, CBT filed its proposed findings of fact and conclusions of law (doc. # 102); this was one week after the close of evidence and was also the due date for the parties' proposed findings. In lieu of filing proposed findings on behalf of the Debtors, Mr. Reis filed the Debtor's Consent to CBT Relief on March 26, 2004. (Tr. p. 49). Mr. Reis testified that once the settlement negotiations broke down with CBT, the Debtors knew they had no leverage with MEP. (Tr. p. 109).

The Court does not find fault with Mr. Reis' decision to engage in settlement discussions with CBT with the intent of using any settlement with CBT as the basis for settlement discussions with MEP. Without knowing the content of the strategy in particular, the Court is willing to give Mr. Reis the benefit of the doubt and find that he may have been justified in withholding the Consent to MEP Relief during the time he was negotiating with CBT. However, Mr. Reis did not contact MEP's counsel when the settlement talks with CBT failed – and hence any hope he had for leverage against MEP evaporated - even though he knew that MEP's Proposed Findings were due the following week (on April 2, 2004). Mr. Reis' delay in filing the Consent to MEP Relief despite the termination of settlement negotiations with CBT and the recognition that there was no plausible defense to MEP's Motions for Relief from Stay raises the specter of bad faith. Mr Reis has presented no evidence to justify the delay in filing the Consent to MEP Relief other than the Debtors' strong dislike of Mr. Enright and MEP. This is troubling. Mr. Reis testified that the Debtors "do not trust and don't like Mr Enright and his people [MEP]" and "the litigation issues . . . became paramount." (Tr. p. 93-94). The record compels the conclusion that if Mr. Reis had contacted MEP's counsel when negotiations with CBT broke down, MEP would not have incurred the additional legal expenses associated with the cost of preparing MEP's Proposed Findings. The time records submitted by MEP reflect that Mr. Williams drafted MEP's Proposed Findings on March 29, 30, 31 and April 2, 2004 (MEP Exhibit 2). Although Mr. Reis and his clients reached the conclusion that they had no leverage to negotiate a settlement with MEP, and no defense to the MEP Motions for Relief from Stay on March 25th, he did not file the Debtors' Consent to MEP Relief until a week later, on April 2nd. This one week delay made the difference between whether MEP did or did not incur the expense of its counsel preparing MEP's Proposed Findings. The filing of the Debtors' Consent to MEP Relief without any notice to Mr. Williams (Tr. p. 11) is an indicator of the magnitude of hostility between the parties and the extent to which civility between counsel had deteriorated. Based upon the record

before it, the Court finds that Mr. Reis has failed to present any credible evidence justifying his failure to file the Debtors' Consent to MEP Relief during the week of March 27 through April 2nd, that this conduct was deliberate and served no proper purpose, and this conduct had the predictable result of delaying the granting of MEP's Motions for Relief from Stay and increasing MEP's attorney's fees.

### B. ACCEDING TO CLIENTS' WISHES VS FULFILLING ETHICAL OBLIGATIONS TO THE COURT

Mr. Reis testified that during Mr. Costello's deposition Mr. Costello made clear that there was intense animosity between the Debtors and MEP (especially MEP's principal, Mr. Todd Enright) and that the personal rancor Mr. Costello felt toward Mr. Enright was the force driving Mr. Costello's opposition to MEP's Motions for Relief from Stay. (Tr. p. 66). Mr. Costello did not want to consent to anything MEP wanted. (Tr. p. 66).[5] Mr. Reis also testified that he advised the Debtors to consent to MEP's Motions for Relief from Stay both during the evidentiary hearing and upon the conclusion of evidence. (Tr. p. 68). On the one hand, Mr. Reis blamed the Debtors for the delay in filing the Consent to MEP Relief. (Tr. pp. 65, 68, 81-83). But, on the other hand, Mr. Reis also acknowledged that he owes an obligation to the Court to advocate only defenses that are factually supported. (Tr. p. 41). This inconsistency makes it very difficult to parse and evaluate Mr. Reis' testimony. Equally troubling, though, was Mr. Reis' admission that there was only minimal legal or factual support for opposing the MEP Motions for Relief from Stay. (Tr. p. 55). If there was not sufficient basis for opposing the relief, no opposition should have been filed. See Rule 9011.

During his testimony, Mr. Reis took great pains to distance himself from the positions he advocated in this case, by claiming the positions he took were solely the position of the Debtors. At one point, Mr. Reis stated:

> I have a whole bunch of clients who take a whole bunch of positions.
> Sometimes I may agree with their business judgments and valuations and such.
> I had no independent basis for agreeing to values or equities [here].

(Tr. p. 41). Mr. Reis testified and argued that he did not receive the Debtors' authority to consent to MEP's Motions for Relief from Stay until a telephone conversation on April 2, 2004, the date the MEP Consent was filed. However, Mr. Reis' telephone records, as submitted to the Court, do not support this contention. (Tr. p. 61). Mr. Reis introduced no other evidence to support this assertion of an April 2nd authorization from his client. The Court finds the record is 8insufficient to demonstrate that Mr. Reis did not have authority to consent until April 2, 2004. At the conclusion of the hearing on CBT's Motion for Relief from Stay, the

---

[5] The Debtors did not testify at the hearing on the Motion for Sanctions and the Opposition. While the Court has a recollection of a representation that counsel had agreed to use the Debtors' deposition testimony in lieu of requiring them to appear and present testimony, this representation is not in the record and neither party offered the depositions into evidence. Consequently, the Court relies upon the live testimony.

debtor gave Mr. Reis the authority to consent to CBT's motion for relief from stay. (Tr. pp. 45-46). However, Mr. Reis did not file any consent at that time. (Id.). Additionally, Mr. Reis testified that once the negotiations with CBT broke down, the Debtors did not anticipate being successful in defending against MEP's Motions for Relief from Stay any further and any leverage against MEP dissipated with the inability to reach a settlement with CBT. (Tr. pp. 92-93). The "litigations issues . . . become [sic] paramount." (Tr. pp. 93-94).

Mr. Reis' failure to draft or submit proposed findings of fact and conclusions of law on behalf of the Debtors undermines this position as well. Contrary to his representations to the Court upon the close of evidence, the record on the Motion for Sanctions persuades the Court that Mr. Reis never had any intention of preparing proposed findings of fact and conclusions of law on MEP's Motions for Relief form Stay. Although Mr. Reis' testimony and billing records indicate that he had spent 1.5 hours in preparation of the Debtors' proposed findings of fact and conclusions of law that were generic to both CBT and MEP (Tr. p. 53), Mr. Reis could not identify any facts presented at the hearing he would have relied upon in asking the Court to deny MEP's Motions for Relief from Stay. (Tr. p. 56-57). Mr. Reis conceded that there was minimal evidentiary basis in the record from the hearings on MEP's Motions for Relief from Stay to support any findings that the Debtors could have submitted to the Court. (Tr. p 55). When asked what evidence and arguments he was going to present to the Court to establish the Debtors' equity in the property if MEP's obligations were recognized, Mr. Reis differentiated his position from that of his clients, responding that the Debtors believed the value of the properties to be higher than the valuation computed by the appraisers and significantly higher than the stipulated values. (Tr. p. 42-43).

When MEP's counsel asked pointed questions about Mr. Reis' obligations, if indeed the Debtors had not consented before April 2nd, Mr. Reis insisted that it was inappropriate to suggest that he could have - or should have - unilaterally consented to MEP's Motions for Relief from Stay without his clients' consent. (Tr. p. 99). The critical question posed in this matter, but never clearly answered or substantiated by Mr. Reis, is: on what date did the Debtors authorize Mr. Reis to consent to MEP's Motions for Relief from Stay? If the factually accurate response is that the Debtors refused to grant Mr. Reis this authority, then additional questions arise: (1) what obligation did Mr. Reis have to discern whether the withholding of consent was improper; and (2) if the withholding of consent was improper, what professional obligation(s) did that impose on Mr. Reis? Neither the Motion for Sanctions nor § 1927 seek to impose a duty on an attorney to take positions on behalf of clients without the clients' authority. However, both § 1927 and the Code of Professional Conduct do impose obligations on attorneys to avoid dilatory tactics. As a licensed attorney, Mr. Reis has ethical obligations to the Court, and to opposing counsel, independent of what a client wants or instructs. The Vermont Code of Professional Conduct provides in relevant part, as follows:

## RULE 3.1 MERITORIOUS CLAIMS AND CONTENTIONS

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.

**Comment**

The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.

The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous, however, if the client desires to have the action taken primarily for the purpose of harassing or maliciously injuring a person, or, if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of exiting law.

## RULE 3.2 EXPEDITING LITIGATION

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.
. . .

**Comment**

Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

## RULE 3.3 CANDOR TOWARD THE TRIBUNAL

(a) A lawyer shall not knowingly:
    (1) make a false statement of material fact or law to a tribunal
. . .

>**Comment**
>
>The advocate's task is to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client is qualified by the advocate's duty of candor to the tribunal. However, an advocate does not vouch for the evidence submitted in a cause; the tribunal is responsible for assessing its probative value.
>
>**RULE 3.4 FAIRNESS TO OPPOSING PARTY AND COUNSEL**
>A lawyer shall not:

. . .

>(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;
>(d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party;
>(e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; or

. . .

VT. CODE OF PROF'L CONDUCT. Moreover, in the event that a client insists on pursuing otherwise, the lawyer has an obligation to withdraw from representing that client. VT. CODE OF PROF'L CONDUCT Rule 1.16 specifically instructs:

>**RULE 1.16 DECLINING OR TERMINATING REPRESENTATION**
>(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
>>(1) the representation will result in violation of the rules of professional conduct or other law;

. . .

>(c) When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

. . .

>**Comment**
>
>. . .
>*Mandatory Withdrawal*
>>A lawyer ordinarily must decline or withdraw from representation if the client demands that the lawyer engage in conduct that is illegal or violates the Rules of Professional Conduct or other law.

V<small>T</small>. C<small>ODE OF</small> P<small>ROF</small>'<small>L</small> C<small>ONDUCT</small>. During the course of his testimony, Mr. Reis acknowledged this obligation to withdraw under certain circumstances (Tr. p. 110) but did not acknowledge the applicability of this obligation to the facts presented. The Court found his testimony on this point to be intentionally non-responsive and vague.

### IV. D<small>ETERMINING THE</small> A<small>MOUNT OF THE</small> S<small>ANCTION</small>

#### A. T<small>HE</small> C<small>AUSAL</small> C<small>ONNECTION</small> B<small>ETWEEN</small> T<small>HE</small> C<small>ONDUCT AND</small> T<small>HE</small> A<small>TTORNEY'S</small> F<small>EES</small> I<small>NCURRED</small>

Under the plain language of the statute, a lawyer who multiplies proceedings unreasonably and vexatiously may personally be assessed the excess costs, expenses, and attorney's fees reasonably incurred as a result. Such sanctions, however, are appropriate only where the attorney has acted in bad faith in the actions that led to the lawsuit or in the conduct of the litigation, or where the attorney has negligently or recklessly failed to perform his responsibilities as an officer of the court. United States v. Seltzer, 227 F.3d 36, 40-42 (2d Cir.2000). As detailed above, the Court finds that Mr. Reis' delay in filing the Debtors' Consent to MEP Relief, combined with his failure to communicate his intent to consent to opposing counsel, constitutes cause for imposing sanctions on Mr. Reis under § 1927. However, the Court also finds that the total amount of attorney's fees requested by MEP, $4,455, was not incurred directly, specifically and solely as a result of Mr. Reis' conduct.

The time sheets submitted by Mr. Williams do not specify how much time was spent on each aspect of the preparation of MEP's Proposed Findings (MEP Exhibit 1). Mr. Williams testified that while preparing MEP's Proposed Findings he spent "a lot of time" figuring the balances of the various loan. (Tr. pp. 28-29). Specifically, Mr. Williams testified that he spent time consulting with his client, examining computer print outs and questioning the accuracy and methodology of those computer print outs, in order to verify the balances due which he included in the Proposed Findings. (Tr. p. 29). While the Court appreciates Mr. Williams' attempts to provide accurate figures for MEP's Proposed Findings (Tr. p. 30), it also observes that one would expect such painstaking and detailed calculations would have been done in preparation for the filing of MEP's Motions for Relief from Stay and thus not necessary at this stage of the proceeding. MEP has not demonstrated a causal connection between Mr. Reis' delay in filing the Debtor's Consent to MEP Relief and Mr. Williams' need to devote significant time to verifying his client's computation of the amount due. The Court finds that the attorney's fees MEP requested should be reduced to subtract the time Mr. Williams spent calculating the loan balances. Since MEP Exhibit 1 does not specify how much time this is, the Court looks at the fee charged, the quality of the final product and the amount of time spent, to determine a reasonable fee for preparing the Proposed Findings. After taking into account the testimony by Mr.

Williams, and considering the Proposed Findings of Fact, the Court finds that a reasonable fee for this legal work is $3,500. This presumes approximately $950 of the fee incurred (and just over 4 hours of the attorney time spent) was attributable to the verification of the amount due, which is consistent with the tenor of Mr. Williams' testimony on this point. (Tr. pp. 28-29). Thus, the Court finds $3,500 to be the amount of the additional expense incurred by MEP as a result of Mr. Reis' conduct and the proper amount of the sanction to be assessed against Mr. Reis.

### B. THE SANCTION AS BOTH REIMBURSEMENT AND A DETERRENT

In fixing the amount of the sanction to be imposed under § 1927, the Court seeks to accomplish the dual goals of making the injured party reasonably whole and punishing the offending party to the extent necessary to discourage repetition of the conduct. In addition to finding that $3,500 constitutes a reasonable attorney's fee for the services performed by MEP's counsel as a direct consequence of the conduct, the Court finds that $3,500 is an appropriate sanction for responding to the facts and circumstances presented here, and that a sanction in this amount is well calculated to serve as an effective deterrent against dilatory practices and abuse of court processes in the future.

### V. CONCLUSION

The Court therefore finds that MEP has sustained its burden of proof, that Mr. Reis's conduct violates 28 U.S.C. § 1927, and MEP is therefore entitled to an award of sanctions. For the reasons set forth above the amount of sanctions the Court finds to be due is $3,500.

This memorandum constitutes the Court's findings of fact and conclusions of law.

Rutland, Vermont  
November 18, 2004

Colleen A. Brown  
United States Bankruptcy Judge